UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

   v.                              Case No. 20-CR-196-1 (BHL)

THOMAS SMITH,

          Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, Stephen Ingraham, Assistant United States Attorney, Daniel Kahn, Acting Chief, Fraud Section, Department of Justice, Laura Connelly, Trial Attorney, Leslie S. Garthwaite, Trial Attorneys, and the defendant, Thomas Smith, individually and by attorney Michael J. Steinle, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### Charges

2.     The defendant has been charged in a fourteen-count Indictment, which alleges that the defendant committed six counts of bank fraud, in violation of Title 18, United States Code, Section 1344 and six counts of money laundering, in violation of Title 18, United States Code, Section 1957.

3.     The defendant has read and fully understands the charges contained in the Indictment. He fully understands the nature and elements of the crimes with which he has been charged, and the charges and the terms and conditions of the plea agreement have been fully

explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to Count Two of the Indictment, attached hereto as Attachment A.

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the charge in Count Two of the Indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment B beyond a reasonable doubt. The defendant admits that these facts are true and correct, and establish his guilt beyond a reasonable doubt.

6.      This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in this offense.

## Penalties

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: thirty (30) years and $1,000,000. The count also carries a mandatory special assessment of $100 and a maximum of five (5) years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraphs 30 and 31 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## Elements

9.      The parties understand and agree that in order to sustain the charge of bank fraud as set forth in Count Two of the Indictment, the government must prove each of the following propositions beyond a reasonable doubt:

2

First, that there was a scheme to obtain moneys, funds, credits, assets, securities, or other property that was owned by or in the care, custody, or control of a bank or financial institution by means of false or fraudulent pretenses, representations or promises, as charged in the indictment; and

Second, that the defendant knowingly carried out and attempted to carry out the scheme; and

Third, that the defendant acted with the intent to defraud; and

Fourth, that the scheme involved a materially false or fraudulent pretense, representation, or promise, and

Fifth, at the time of the charged offense the deposits of the bank or other financial institution were insured by the Federal Deposit Insurance Corporation.

## Sentencing Provisions

10.    The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.    The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.    The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions, which they believe to be applicable to the offense set forth Attachment A. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.    The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the

3

defendant's criminal history.

<b><u>Sentencing Guidelines Calculations</u></b>

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range.  The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

<b><u>Relevant Conduct</u></b>

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

<b><u>Base Offense Level</u></b>

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two of the Indictment is seven (7) under Sentencing Guidelines Manual § 2B1.1(a)(1).

<b><u>Specific Offense Characteristics</u></b>

17.     The parties further agree that a 14-level increase for a loss exceeding $550,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(H) is applicable to the offense level for the offense charged in Count Two of the Indictment.

18.     The parties further agree that a 2-level increase for an offense involving sophisticated means under Sentencing Guidelines Manual § 2B1.1(b)(10) is applicable to the offense level for the offense charged in Count Two of the Indictment.

4

19.     The government will seek a 2-level increase for the defendant's role as an organizer, leader, manager, or supervisor under Sentencing Guidelines Manual § 3B1.1(c) for the offense charged in Count Two of the Indictment.

20.     The government will seek a 2-level increase for obstructing or impeding the administration of justice under Sentencing Guidelines Manual § 3B1.1(c) for the offense charged in Count Two of the Indictment.

## Acceptance of Responsibility

21.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

22.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

23.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

24.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

25. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## Financial Matters

27. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

28. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 45 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and

6

sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU, whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets.

### Special Assessment

29.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Restitution

30.     The parties acknowledge and understand that the government will recommend to the sentencing court that restitution be ordered and that it be apportioned among co-schemers to reflect the level of contribution to the victim's loss and economic circumstances of each conspirator pursuant to Title 18, United States Code, Section 3664(h). The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources.

31.     The defendant agrees to pay restitution as ordered by the sentencing court. The defendant agrees to cooperate in efforts to collect any restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

### Forfeiture

32.     The defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained from the offense.

33.     The defendant acknowledges that as part of his sentence, the Court will decide, by a preponderance of the evidence, whether the government has established the requisite nexus

7

between the offense and any specific property alleged to be subject to forfeiture and the amount of a personal money judgment he must pay.

## **Defendant's Waiver of Rights**

34. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a

8

conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

       e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

35.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

36.    The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

37.    The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

38.    The defendant knowingly and voluntarily waives any claim or objection he may

9

have based on statute of limitations.

39. The defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. Section 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

### Further Civil or Administrative Action

40. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### General Matters

41. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

42. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

43. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

44. The defendant understands that pursuant to the Victim and Witness Protection

10

Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Effect of Defendant's Breach of Plea Agreement

45.    The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

### Voluntariness of Defendant's Plea

46.    The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

11

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _1-2 2-21_ _____

THOMAS SMITH
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _1-22-21_ _____

MICHAEL J. STEINLE
Attorney for Defendant

For the United States of America:

Date: _1/22/2021_ _____

LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

_____

MATTHEW KRUEGER
United States Attorney
Eastern District of Wisconsin

_____

STEPHEN INGRAHAM
Assistant United States Attorney

12

**Attachment A**

Case 2:20-cr-00196-BHL   Filed 01/22/21   Page 13 of 37   Document 53

UNITED STATES OF AMERICA,

Plaintiff.

v.

THOMAS E. SMITH,
STEPHEN E. SMITH,
SAMUEL A. DAVIS,
ROBERT HAMILTON, and
JONATHAN E. HENLEY,

Defendants.

Case No. 20-CR-
[18 U.S.C. §§ 1344, 1957, and 2]

**SEALED**  20-CR-196

---

### INDICTMENT

---

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At all times material to this Indictment:

#### *The Defendants and Relevant Entities*

1.     THOMAS E. SMITH was a resident of Pewaukee, Wisconsin, and the registered agent of T & T Holdings LLC ("T&T Holdings"), a Wisconsin limited liability company.  T&T Holdings was administratively dissolved on or about March 20, 2017.

2.     STEPHEN E. SMITH was a resident of Milwaukee, Wisconsin, and the registered agent of CFA Auto Transport LLC ("CFA"), a Wisconsin limited liability company, and Complete Fundamentals, Inc. ("Complete Fundamentals"), a Wisconsin non-stock corporation.  S. SMITH was also the organizer of New Beginnings Family Services LLC ("New Beginnings"), a Wisconsin limited liability company.

3.    SAMUEL A. DAVIS was a resident of Chicago, Illinois, and the registered agent and president of *Davis Development Group Inc.* ("Davis Development"), an Illinois corporation.

4.    ROBERT HAMILTON was a resident of Milwaukee, Wisconsin, and the president and registered agent of Glory Transportation Services, LLC ("Glory Transportation"), a Wisconsin limited liability company.

5.    JONATHAN E. HENLEY was a resident of Chicago, Illinois, and the manager and one of the registered agents of Premier Logistic Solutions LLC ("Premier Logistic"), an Illinois limited liability company.

6.    Individual 1 was a resident of Milwaukee, Wisconsin, and the registered agent of Rebels Paris, LLC ("Rebels"), a Wisconsin limited liability company.

7.    Individual 2 was a resident of Milwaukee, Wisconsin, and the registered agent of Comfort Care Transit LLC ("Comfort Care"), a Wisconsin limited liability company.

8.    Individual 3 was a resident of Milwaukee, Wisconsin. On or about May 21, 2020, Individual 3 filed paperwork with the State of Wisconsin establishing himself as the registered agent of New Beginnings.

### *The Small Business Administration*

9.    The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

10.    As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

2

*The Paycheck Protection Program*

11.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

12.     One source of relief that the CARES Act provided was the authorization of up to $349 billion in forgivable loans to small businesses for payroll, mortgage interest, rent/lease, and utilities, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized up to $310 billion in additional PPP funding.

13.     The PPP allowed qualifying small businesses and other organizations to receive PPP loans. Businesses were required to use PPP loan proceeds on payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

14.     The amount of a PPP loan that a small business was entitled to receive was determined by the number of employees employed by the business and the business's average monthly payroll costs.

15.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was

3

eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

16. The SBA oversaw the PPP. However, individual PPP loans were issued by private, approved lenders who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

### *Relevant Financial Institutions*

17. Financial Institution 1 was a federally insured financial institution and member of the Federal Home Loan Bank System headquartered in Green Bay, Wisconsin. Financial Institution 1 was an approved SBA lender and participated as a PPP lender to small businesses.

18. Financial Institution 2 was a Federal Deposit Insurance Corporation-insured bank headquartered in Minneapolis, Minnesota.

19. Credit Union 1 was a nationally insured credit union headquartered in Racine, Wisconsin.

### COUNTS ONE THROUGH SIX
*Bank Fraud* – 18 U.S.C. § 1344 and § 2

20. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 19 of this Indictment as if fully set forth herein.

### *The Scheme to Defraud*

21. From in or about April 2020 through in or about July 2020, in the State and Eastern District of Wisconsin and elsewhere,

4

THOMAS E. SMITH,
STEPHEN E. SMITH,
SAMUEL A. DAVIS,
ROBERT HAMILTON, and
JONATHAN E. HENLEY,

and others known and unknown to the Grand Jury, and aided and abetted by each other, did knowingly execute and attempt to execute a scheme and artifice to defraud Financial Institution 1, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, certain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Financial Institution 1.

### The Purpose of the Scheme and Artifice

22.    It was the purpose of the scheme for defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, and HENLEY, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by: (a) submitting false and fraudulent PPP loan applications to financial institutions falsely representing that the applicant entities were functional and operational businesses and falsely promising to use the fund proceeds on covered business expenses, and (b) concealing and causing the concealment of these false and fraudulent applications.

### Manner and Means of the Scheme

23.    It was part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, Individual 3, and others, submitted and caused to be submitted fraudulent PPP loan applications to Financial Institution 1 for the purpose of obtaining funds from Financial Institution 1.

24.    It was further part of the scheme that each of the PPP loan applications falsely claimed that the PPP loan applicant company was in operation as of February 15, 2020, when in fact it was not, and that it employed individuals for whom it paid salaries and payroll taxes, or paid independent contractors (as reported on IRS Form 1099-MISC).    In fact, CFA, Davis

5

Development, New Beginnings, Comfort Care, and Premier Logistic were not in operation in February 2020. Specifically:

    a.  CFA's loan application falsely claimed that it was operational as of February 15, 2020, when in fact it was not and went into "delinquent" status with the Wisconsin Department of Financial Institutions ("WDFI") on or about July 1, 2019. CFA's application did not report that S. SMITH restored the active status of CFA with WDFI on or about May 5, 2020.

    b.  Davis Development's loan application falsely claimed that it was operational as of February 15, 2020, when in fact Davis Development had been administratively dissolved with the Illinois Secretary of State ("ILSOS") as of on or about August 10, 2018. Davis Development's application did not report that DAVIS reinstated the company on or about May 2, 2020.

    c.  New Beginnings' loan application falsely claimed that it was operational as of February 15, 2020, when in fact New Beginnings had been administratively dissolved with WDFI *as of on* or about April 13, 2020. New Beginnings' application did not report that S. SMITH reinstated the company on or about May 1, 2020.

    d.  *Comfort Care's loan application falsely claimed that it was operational as of* February 15, 2020, when in fact Comfort Care was administratively dissolved with WDFI on June 13, 2017. Comfort Care's application did not report that Individual 2 restored the active status of Comfort Care with WDFI on or about May 12, 2020.

    e.  Premier Logistic's loan application falsely claimed that it was operational as of February 15, 2020, when in fact Premier Logistic had been administratively dissolved with the ILSOS as of on or about June 14, 2019. Premier Logistic's application did not report that HENLEY reinstated the company on or about May 14, 2020.

    25.  It was further part of the scheme that each of the PPP loan applications falsely certified that the PPP loan applicant company employed individuals for whom it paid salaries and

6

payroll taxes, or paid independent contractors (as reported on IRS Form 1099-MISC) and falsely represented the number of employees each company employed. Each of the PPP loan applications also included falsified Employer's Quarterly Federal Tax Returns (IRS Forms 941) for each quarter of 2019 and the first quarter of 2020. In fact, none of the businesses had filed Forms 941 in any quarter of 2019 or the first quarter of 2020, meaning that the company had no employees for which federal taxes were paid during that period. Specifically:

      a. CFA's loan application falsely claimed that its average monthly payroll was $97,000 and that it employed 38 people.

      b. Comfort Care's loan application falsely claimed that its average monthly payroll was $92,000 and that it employed 23 people.

      c. Davis Development's loan application falsely claimed that its average monthly payroll was $71,000 and that it employed 20 people.

      d. New Beginnings' loan application falsely claimed that its average monthly payroll was $92,000 and that it employed 28 people.

      e. Premier Logistic's loan application falsely claimed that its average monthly payroll was $85,000 and that it employed 23 people.

      f. Rebels' loan application falsely claimed that Rebels' average monthly payroll was $62,000 and that it employed 17 people.

      g. Glory Transportation's loan application falsely claimed that Glory Transportation's average monthly payroll was $62,000 and that it employed 14 people.

    26. It was further part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, Individual 3, and others falsely represented the intended use of the funds, claiming that the funds would be used for legitimate business expenses. Specifically, CFA, Comfort Care, Davis Development, New Beginnings, Premier

7

Logistic, and Rebels' loan applications each falsely claimed that it intended to spend loan proceeds on payroll, lease or mortgage expenses, interest, and utilities. In fact, the loan funds were used for, among other things, personal expenses and other non-business expenses.

27. It was further part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HENLEY, Individual 1, Individual 2, Individual 3, and others opened or directed others to open bank accounts at Financial Institution 1 to facilitate and expedite obtaining PPP loan funds, including:

    a.  On or about May 5, 2020, S. SMITH opened bank account No. x8659 at Financial Institution 1 in the name of CFA.

    b.  On or about May 5, 2020, DAVIS opened bank account No. x8733 at Financial Institution 1 in the name of Davis Development.

    c.  On or about May 8, 2020, Individual 1 opened bank account No. x9383 at Financial Institution 1 in the name of Rebels.

    d.  On or about May 13, 2020, Individual 2 opened bank account No. x2840 at Financial Institution 1 in the name of Comfort Care.

    e.  On or about May 19, 2020, HENLEY opened bank account No. x7764 at Financial Institution 1 in the name of Premier Logistic.

    f.  On or about May 22, 2020, Individual 3 opened bank account No. x6862 at Financial Institution 1 in the name of New Beginnings.

28. It was further part of the scheme that after the PPP loans were deposited into the applicant company's bank account at Financial Institution 1, defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, Individual 1, Individual 2, and Individual 3 transferred or directed the transfer of the loan proceeds to each other, and to entities controlled by one of the defendants, enabling them to enrich themselves from the loan proceeds.

8

29.    It was further part of the scheme that when defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, and Individual 3 learned that Financial Institution 1 froze or inquired about their loan applications, that Defendants, Individual 1, Individual 2, and Individual 3 took steps to misrepresent, conceal, hide and cause to be misrepresented, concealed, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

30.    It was further part of the scheme that in total, at least approximately $960,000 was provided to Defendants, Individual 1, Individual 2, and Individual 3 in fraudulently obtained loan proceeds, and an additional $442,500 was attempted to be fraudulently obtained by Defendants, Individual 1, Individual 2, and Individual 3.

*Executions*

31.    On or about the following dates, in the State and Eastern District of Wisconsin and elsewhere, Defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, and HENLEY, aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly execute and attempt to execute the above-described scheme to defraud by committing and willfully causing others to commit the following acts, each of which constituted an execution of the fraudulent scheme:

| Count | Defendant(s) | Approximate Date | Acts | Approximate Amount Sought in Loan |
|---|---|---|---|---|
| 1 | T. SMITH DAVIS | April 26, 2020 | Submission of fraudulent PPP loan application for Davis Development to Financial Institution 1 | $177,500 |
| 2 | T. SMITH S.SMITH | May 1, 2020 | Submission of fraudulent PPP loan application for CFA to Financial Institution 1 | $242,500 |
| 3 | T. SMITH HAMILTON | May 1, 2020 | Submission of fraudulent PPP loan application for Glory Transportation to Financial Institution 1 | $155,000 |

| Count | Defendant(s) | Approximate Date | Act | Approximate Amount Sought in Loan |
|---|---|---|---|---|
| 4 | T. SMITH S. SMITH | May 8, 2020 | Submission of fraudulent PPP loan application for Rebels to Financial Institution 1 | $155,000 |
| 5 | T. SMITH | May 15, 2020 | Submission of fraudulent PPP loan application for Comfort Care to Financial Institution 1 | $230,000 |
| 6 | T. SMITH HENLEY | May 20, 2020 | Submission of fraudulent PPP loan application for Premier Logistic to Financial Institution 1 | $212,500 |

Each in violation of Title 18, United States Code, Sections 1344(2) and 2.

10

## COUNTS SEVEN THROUGH FOURTEEN
*Money Laundering – 18 U.S.C. § 1957*

32.     The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 31 of this Indictment as if fully set forth herein.

33.     On the dates specified below, in the State and Eastern District of Wisconsin and elsewhere, Defendants T. SMITH, S.SMITH, DAVIS, and HAMILTON, aided and abetted by each other and by others known and unknown to the Grand Jury, knowingly engaged in, attempted to engage in, and caused others to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transaction involved criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344:

| Count | Defendant(s) | Approximate Date | Description of Transaction |
|---|---|---|---|
| 7 | HAMILTON | May 6, 2020 | Cashier's check for approximately $30,000 withdrawn from Glory Transportation's Financial Institution 1 account No. x2240, written to T. SMITH. |
| 8 | HAMILTON | May 8, 2020 | Cashier's check for approximately $50,000 withdrawn from Glory Transportation's Financial Institution 1 account No. x2240, deposited into Credit Union 1 account No. x2707, held in the name of HAMILTON. |
| 9 | T. SMITH | May 18, 2020 | Cashier's check for approximately $20,000 withdrawn from Rebels' Financial Institution 1 account No. x9383, deposited into Financial Institution 1 account ending in 1719, held in the name of T&T Holdings. |
| 10 | S. SMITH | May 18, 2020 | Cashier's check for approximately $20,000 withdrawn from Rebels' account No. x9383, deposited into Financial Institution 2 account No. x4088, held in the name of S. SMITH d/b/a Complete Fundamentals. |

11

| Count | Defendant(s) | Approximate Date | Description of Transaction |
|---|---|---|---|
| 11 | T. SMITH | May 20, 2020 | Cashier's check for approximately $40,000 withdrawn from Comfort Care's Financial Institution 1 account No. x2840, deposited into Financial Institution 1 account No. x4241, held in the name of T. SMITH. |
| 12 | T. SMITH DAVIS | May 21, 2020 | Cashier's check for approximately $75,000 withdrawn from Davis Development's Financial Institution 1 account No. x8733, deposited into Financial Institution 1 account No. x1719, held in the name of T&T Holdings. |
| 13 | T. SMITH S. SMITH | May 22, 2020 | Cashier's check for approximately $25,000 withdrawn from CFA's Financial Institution 1 account No. x8659, deposited into Financial Institution 1 account No. x1719, held in the name of T&T Holdings. |
| 14 | S. SMITH | May 22, 2020 | Cashier's check for approximately $25,000 withdrawn from CFA's Financial Institution 1 account No. x8659, deposited into Financial Institution 2 account No. x4088, held in the name of S. SMITH d/b/a Complete Fundamentals. |

Each in violation of Title 18, United States Code, Section 1957 and Section 2.

## FORFEITURE ALLEGATIONS

The allegations contained in Counts 1-14 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction of an offense alleged in Counts 1-14, Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), any property that constitutes or is traceable to proceeds of the offense. This property includes, but is not limited to, a sum of money reflecting the proceeds Defendants obtained from the offense.

The allegations contained in Counts 1-14 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction of an offense alleged in Counts 1-14, Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property involved in the offense, or any property traceable to such property. This property includes, but is not limited to, a sum of money reflecting the proceeds Defendants obtained from the offense.

If any of the above-described forfeitable property, as a result of any act or omission of the Defendants,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek the forfeiture of any other property of the

13

Defendants, up to the value of the above-described forfeitable property.

A TRUE BILL:

███████████████

FOREPERSON /

Dated: _10 - 20 - 2020_

_(signature)_
── MATTHEW D. KRUEGER
   United States Attorney

_(signature)_
── DANIEL KAHN
   Acting Chief, U.S. Department of Justice, Fraud Section

14

**Attachment B**

The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

*The Paycheck Protection Program*

1.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

2.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications, including that the business was in operation on February 15, 2020, in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

3.      A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

4.      PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

5.      The PPP is overseen by the SBA, which is headquartered at 409 3rd Street SW, Washington, D.C. 20416, and has authority over all loans. Individual PPP loans, however, are issued by private approved lenders (most commonly, banks and credit unions), which receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

6.      Bank 1 is an SBA-approved lender headquartered in Green Bay, Wisconsin. At the time of the charged offense, the deposits of Bank 1 were insured by the Federal Deposit

Insurance Corporation.

7.     As described in more detail below, the defendant caused the submission of eight fraudulent PPP loans seeking approximately $1,250,000 in total.

***Participants in the Schemes***

8.     The defendant was a resident of Pewaukee, Wisconsin and the registered agent of T & T Holdings LLC ("T&T Holdings"), a Wisconsin limited liability company.

9.     Co-Conspirator 2 ("CC-2") was the registered agent of CFA Auto Transport LLC ("CFA"), a Wisconsin limited liability company. CC-2 was also the organizer of New Beginnings Family Services LLC ("New Beginnings"), a Wisconsin limited liability company.

10.     Marvin Fitzgerald ("Fitzgerald") was a resident of Milwaukee, Wisconsin. On or about May 21, 2020, Fitzgerald filed paperwork with the State of Wisconsin establishing himself as the registered agent of New Beginnings.

11.     Deon Petty ("Petty") was the registered agent of Rebels Paris, LLC ("Rebels"), a Wisconsin limited liability company.

12.     Jonathan Henley ("Henley") was the manager and one of the registered agents of Premier Logistic Solutions LLC ("Premier Logistic"), an Illinois limited liability company.

13.     Samuel Davis ("Davis") was the owner and registered agent of Davis Development Group, Inc. ("Davis Development"), an Illinois corporation based in Chicago, Illinois.

14.     Robert Hamilton ("Hamilton") was the president and registered agent of Glory Transportation Services, LLC ("Glory Transportation"), a Wisconsin limited liability company.

15.     Co-Conspirator 8 ("CC-8") was the registered agent of Charisma Care Family Services, LLC ("Charisma Care"), a Wisconsin limited liability company.

16.     Tarone Woods ("Woods") was the owner and registered agent of Comfort Care Transit LLC ("Comfort Care"), a Wisconsin limited liability company.

17.     As of February 15, 2020, none of the above listed companies had any employees for whom they paid salaries or payroll taxes, or independent contractors as reported on an IRS Form 1099-MISC.

18.     The defendant's scheme involved his facilitating the submission of fraudulent loan applications for CC-2, CC-8, Fitzgerald, Petty, Henley, Davis, Hamilton, and Woods for each of their companies, with the defendant receiving proceeds of each.

15

*The Fraudulent CFA PPP Loan Application to Bank 1*

19.     In or around April 2020, after the defendant had applied for and received PPP loans for his own companies, CC-2 approached the defendant to help him obtain a PPP loan for CFA. The defendant agreed to help CC-2 apply for a PPP loan for CFA by assisting CC-2 with creating false documents to apply for the loan.

20.     The defendant helped CC-2 create a fraudulent PPP loan application package for CFA that requested a $242,500 PPP loan. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting CFA's payroll data from January 2019 to March 2020  The CFA PPP application submitted to Bank 1 falsely stated that CFA's average monthly payroll was $97,000 and that the company had 38 employees. The defendant knew that none of this information was accurate when he helped to create the application.

21.     The SBA Form 2483 that the defendant helped create falsely certified that CFA was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

22.     The IRS Forms 941 included with the PPP loan application that the defendant helped create falsely represented, among other things, that CFA had 38 employees. The purported Form 941 for the first quarter of 2020, falsely represented that CFA had paid $290,106.46 in wages, tips, and other compensation and had 38 employees. In fact, CFA made no quarterly tax filings in 2019 or in the first quarter of 2020.

23.     On or about May 1, 2020, CC-2 physically dropped off the CFA PPP application at a Bank 1 branch. On or about May 6, 2020, Bank 1 approved the PPP loan and wired approximately $242,500 to the CFA business checking account at Bank 1.

24.     Before submitting the application, CC-2 agreed to pay the defendant part of the PPP loan proceeds. After receiving the PPP funds, and at the defendant's direction, CC-2 obtained three cashier's checks totaling $65,000 payable to the defendant and two of his entities.

*The Fraudulent Rebels PPP Loan Application to Bank 1*

25.     In or around May 2020, the defendant, CC-2, and Petty agreed to obtain a fraudulent loan for Rebels from Bank 1. Petty provided CC-2 with certain information about Rebels, including the company's address and tax identification number. The defendant agreed to assist CC-2 with creating false documents to apply for the Rebels loan.

26.     The defendant helped CC-2 create a fraudulent PPP loan application package for Rebels that requested a $155,000 PPP loan. Included with the loan application package were (1)

16

an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Rebels' payroll data from January 2019 to March 2020. The Rebels PPP application submitted to Associated Bank stated that Rebels' average monthly payroll was $62,000 and that the company had 17 employees. The defendant knew that none of this information was accurate when he created the application.

27.     The SBA Form 2483 that the defendant helped create falsely certified that Rebels was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

28.     The IRS Forms 941 that were included with the PPP loan application that the defendant helped create falsely represented, among other things, that Rebels had 17 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Rebels had paid $190,486.16 in wages, tips, and other compensation to its 17 employees. In fact, Rebels made no quarterly tax filings in 2019 or in the first quarter of 2020.

29.     On or about May 8, 2020, Bank 1 received the Rebels PPP application at a Bank 1 branch. On or about May 18, 2020, Bank 1 approved the PPP loan and wired approximately $155,000 to the Rebels business checking account at Bank 1.

30.     Petty agreed to pay the defendant and CC-2 part of the PPP loan proceeds. On or about May 20, 2020, Petty distributed $45,000 to the defendant and two of his entities through cashier's checks.

31.     On or about June 7, 2020, Bank 1 froze the funds in the Rebels business account. After Bank 1 froze the account, the defendant created a fake lease between his company, T&T Holdings, and Rebels to explain the payment. The defendant provided the fake lease to both Petty and Bank 1. When the defendant created the lease and provided it to Bank 1, he did not plan to lease any property to Petty, and the defendant did not provide Petty with the property identified in the lease. The defendant created the lease to conceal the true purpose of Petty's payment to T&T Holdings.

### The Fraudulent New Beginnings PPP Loan Application to Bank 1

32.     In or around May 2020, the defendant agreed to assist CC-2 and Fitzgerald in obtaining a fraudulent loan for New Beginnings from Bank 1.

33.     The defendant helped CC-2 create a fraudulent PPP loan application package for New Beginnings that requested a $155,000 PPP loan. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting New Beginnings' payroll data from January 2019 to March 2020. Fitzgerald submitted the loan application to Bank 1.

17

The New Beginnings PPP application submitted to Bank 1 falsely stated that New Beginnings' average monthly payroll was $92,000 and that the company had 28 employees. The New Beginnings loan application was denied.

### *The Fraudulent Premier Logistic PPP Loan Application to Bank 1*

34.     In or around May 2020, Davis introduced Henley to the defendant to facilitate getting a PPP loan for Premier Logistic. Henley provided the defendant with certain information about Premier Logistic, including the company's address and tax identification number. The defendant used this information to create false documents to apply for a PPP loan. In or around May 2020, the defendant provided Henley with a completed Premier Logistic PPP loan application containing false information about Premier Logistic, including false statements about its operational status and employees. The defendant directed Henley to sign the application and drop it off at a Bank 1 branch.

35.     The fraudulent PPP loan application package for Premier Logistic that the defendant created requested a $212,500 PPP loan for Premier Logistic. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Premier Logistic's payroll data from January 2019 to March 2020 The Premier Logistic PPP application submitted to Bank 1 falsely stated that Premier Logistic's average monthly payroll was $85,000 and that the company had 23 employees. The defendant knew that none of this information was accurate when he created the application.

36.     The SBA Form 2483 that the defendant created falsely certified that Premier Logistic was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

37.     The IRS Forms 941 that were included with the PPP loan application that the defendant created falsely represented, among other things, that Premier Logistic had 23 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Premier Logistic had paid $255,789.45 in wages, tips, and other compensation to its 23 employees. In fact, Premier Logistic made no quarterly tax filings in 2019 or in the first quarter of 2020.

38.     On or about May 20, 2020, Henley physically dropped off the fraudulent PPP loan application for Premier Logistic at a branch of Bank 1 in Wisconsin.

39.     Before submitting the application, Henley agreed to pay the defendant part of the PPP loan proceeds. Ultimately, Bank 1 did not approve the Premier Logistic PPP loan.

18

*The Fraudulent Davis Development PPP Loan Application to Bank 1*

40.     In or around April 2020, the defendant, CC-2, and Davis agreed to obtain a fraudulent loan for Davis Development from Bank 1. In April 2020, Davis Development was not operational and was not in good standing with the State of Illinois. The defendant sent Davis $400 to be used towards the fee required to reinstate Davis Development with the State of Illinois. Davis provided the defendant with certain information about Davis Development, including the company's address and tax identification number. The defendant used this information to create false documents to apply for a PPP loan. In or around May 2020, the defendant provided Davis with a completed Davis Development PPP loan application containing false information about Davis Development, including false statements about its operational status and employees. The defendant directed Davis to sign the application and drop it off at a Bank 1 branch.

41.     The fraudulent PPP loan application package for Davis Development that the defendant created, requested a $177,500 PPP loan for Davis Development. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Davis Development's payroll data from January 2019 to March 2020 The Davis Development PPP application submitted to Bank 1 falsely stated that Davis Development's average monthly payroll was $71,000 and that the company had 20 employees. The defendant knew that none of this information was accurate when he created the application.

42.     The SBA Form 2483 that the defendant created falsely certified that Davis Development was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

43.     The IRS Forms 941 that were included with the PPP loan application that the defendant created falsely represented, among other things, that Davis Development had 20 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Davis Development had paid $214,785.74 in wages, tips, and other compensation to its 20 employees. In fact, Davis Development made no quarterly tax filings in 2019 or in the first quarter of 2020.

44.     On or about May 6, 2020, Davis physically dropped off the application at a Bank 1 branch. On or about May 8, 2020, Bank 1 approved the PPP loan and wired approximately $177,500 to the Davis Development business checking account at Bank 1.

45.     Before submitting the application, Davis agreed to pay the defendant and CC-2 $75,000 of the PPP loan proceeds. After receiving the PPP funds, and at the defendant's direction, Davis obtained a cashier's check from Davis Development's business checking account for $75,000 payable to T&T Holdings. The defendant and CC-2 drove to the Davis's home in Chicago and picked up the check.

19

46.     In or around June 2020, after Bank 1 had frozen some of the defendant's accounts, the defendant contacted Davis.  The defendant provided Davis with a fake joint venture agreement by email and told Davis that he should sign it to make it look like the $75,000 payment was for an investment Davis Development was making with T&T Holdings into a nursing home.  The defendant created the fake joint venture agreement in order to provide it to Bank 1 and conceal the true purpose of Davis's payment to T&T Holdings.

### *The Fraudulent Glory Transportation PPP Loan Application to Bank 1*

47.     In or around April 2020, Hamilton went to the defendant's office to discuss getting the PPP loan for Glory Transportation.  Hamilton provided the defendant with certain information about Glory Transportation, including the company's address and tax identification number.  The defendant used this information to create false documents to apply for a PPP loan.  In or around May 2020, the defendant provided Hamilton with a completed Glory Transportation PPP loan application containing false information about Glory Transportation, including false statements about its operational status and employees.  The defendant directed Hamilton to sign the application and drop it off at a Bank 1 branch.

48.     The fraudulent PPP loan application package for Glory Transportation that the defendant created requested a $155,000 PPP loan.  Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Glory Transportation's payroll data from January 2019 to March 2020  The Glory Transportation PPP application submitted to Bank 1 falsely stated that Glory Transportation's average monthly payroll was $62,000 and that the company had 14 employees.  The defendant knew that none of this information was accurate when he created the application.

49.     The SBA Form 2483 that the defendant created falsely certified that Glory Transportation was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC."  The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule."  The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

50.     The IRS Forms 941 that were included with the PPP loan application that the defendant created falsely represented, among other things, that Glory Transportation had 14 employees.  The purported Form 941 for the first quarter of 2020, falsely represented that Glory Transportation had paid $188,673.45 in wages, tips, and other compensation to its 14 employees.  In fact, Glory Transportation made no quarterly tax filings in 2019 or in the first quarter of 2020.

51.     On or about May 1, 2020, Hamilton physically dropped off the application at a Bank 1 branch.  On or about May 5, 2020, Bank 1 approved the PPP loan and wired approximately $155,000 to the Glory Transportation business checking account at Bank 1.

20

52.     Before submitting the application, Hamilton agreed to pay the defendant $30,000 of the PPP loan proceeds. After receiving the PPP funds, and at the defendant's direction, on or about May 6, 2020, Hamilton obtained a cashier's check from Glory Transportation's business checking account for $30,000 payable to the defendant.

53.     When Hamilton dropped off the cashier's check to the defendant, the defendant directed Hamilton that if anyone asked about why Hamilton was paying the defendant money from the loan, Hamilton should say that it was for equipment or vans. The defendant knew this was false, because Hamilton paid the defendant only for completing the fraudulent loan paperwork. During the conversation, the defendant also told Hamilton to pay CC-2 $10,000, because CC-2 came up with the idea for Hamilton to apply for the loan. Hamilton declined to pay CC-2.

### *The Fraudulent Charisma Care PPP Loan Application to Bank 1*

54.     In or around May 2020, the defendant and CC-8 agreed to obtain a fraudulent loan for Charisma Care from Bank 1. CC-8 provided the defendant with certain information about Charisma Care, including the company's address and tax identification number. The defendant used this information to create false documents to apply for a PPP loan. In or around May 2020, the defendant provided CC-8 with a completed Charisma Care PPP loan application containing false information about Charisma Care, including false statements about its operational status and employees. The defendant directed CC-8 to drop it off at a Bank 1 branch.

55.     The fraudulent PPP loan application package for Charisma Care that the defendant created requested a $107,500 PPP loan. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Charisma Care's payroll data from January 2019 to March 2020. The Charisma Care PPP application submitted to Associated Bank stated that Charisma Care's average monthly payroll was $43,000 and that the company had 15 employees. The defendant knew that none of this information was accurate when he created the application.

56.     The SBA Form 2483 that the defendant created falsely certified that Charisma Care was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

57.     The IRS Forms 941 that were included with the PPP loan application that the defendant created falsely represented, among other things, that Charisma Care had 15 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Charisma Care had paid $127,8927.37 [*sic*] in wages, tips, and other compensation to its 15 employees. In fact, Charisma Care made no quarterly tax filings in 2019 or in the first quarter of 2020.

58.     In or around May 2020, CC-8 dropped off the application at a Bank 1 branch.  On or about May 6, 2020, Bank 1 approved the PPP loan and wired approximately $107,500 to the Charisma Care business checking account at Bank 1.

59.     Before submitting the application, CC-8 agreed to pay the defendant a portion of the PPP loan proceeds.  On or about May 20, 2020, at the defendant's direction, CC-8 obtained a cashier's check from Charisma Care's business checking account for $40,000 payable to one of the defendant's entities.

### The Fraudulent Comfort Care PPP Loan Application to Bank 1

60.     In or around May 2020, the defendant and Woods agreed to obtain a fraudulent loan for Comfort Care from Bank 1.  Woods provided the defendant with certain information about Comfort Care, including the company's address and tax identification number.  The defendant used this information to create false documents to apply for a PPP loan.  In or around May 2020, the defendant provided Woods with a completed Comfort Care PPP loan application containing false information about Comfort Care, including false statements about its operational status and employees.  The defendant directed Woods to sign the application and drop it off at a Bank 1 branch.

61.     The fraudulent PPP loan application package for Comfort Care that the defendant created requested a $230,000 PPP loan.  Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Comfort Care's payroll data from January 2019 to March 2020.  The Comfort Care PPP application submitted to Associated Bank stated that Comfort Care's average monthly payroll was $92,000 and that the company had 23 employees.  The defendant knew that none of this information was accurate when he created the application.

62.     The SBA Form 2483 that the defendant created falsely certified that Comfort Care was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC."  The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule."  The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

63.     The IRS Forms 941 that were included with the PPP loan application that the defendant created falsely represented, among other things, that Comfort Care had 23 employees.  The purported Form 941 for the first quarter of 2020, falsely represented that Comfort Care had paid $277,817.45 in wages, tips, and other compensation to its 23 employees.  In fact, Comfort Care made no quarterly tax filings in 2019 or in the first quarter of 2020.

64.     On or about May 18, 2020, Woods physically dropped off the application at a Bank 1 branch.  On or about May 5, 2020, Bank 1 approved the PPP loan and wired

22

approximately $230,000 to the Comfort Care business checking account at Bank 1.

65.     Before submitting the application, Woods agreed to pay the defendant a portion of the PPP loan proceeds. On or about May 20, 2020, at the defendant's direction, Woods obtained three cashier's check from Comfort Care's business checking account for $115,000 payable to the defendant and his entities.

### False Statements to Bank 1

66.     On or about June 8, 2020, a representative of Bank 1 called the defendant to ask about the money he received from the PPP loans. The defendant made the following false statements to the Bank 1 representative:

     a. The $65,000 he received from CC-2 from the CFA loan was payment for equipment and a trailer he sold to CC-2;
     b. The $45,000 he received from Petty from the Rebels loan was an advance rent payment;
     c. The $75,000 he received from Davis from the Davis Development loan was for an investment in the purchase of a nursing home; and
     d. The $115,000 he received from Woods was for the purchase of a truck and a couple of other vehicles.

None of these statements were true, and the defendant knew that they were false when he made them. The defendant made the statements to conceal the true purpose of the payments.

67.     On or about June 8, 2020, after speaking with the Bank 1 representative, the defendant also created fake documents to conceal the true purpose of the payments to provide to Bank 1. These documents included:

     a. A fake Bill of Sale for a Ford F350 between the defendant and CFA;
     b. A fake Bill of Sale for Ford F350 Super Duty between the defendant and Comfort Care;
     c. A fake Commercial Lease Agreement between T&T Holdings and Rebels; and
     d. A fake Joint Venture Agreement between T&T Holdings and Davis Development.

### Deleted Emails and Text Messages

68.     In order to misrepresent, conceal, and hide the schemes, the defendant deleted emails and text messages he sent and received related to the schemes. The defendant also directed others, including Woods, to delete emails and text messages related to the schemes.

69.     At all times, the defendant acted knowingly and intentionally.