UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,
          Plaintiff,

v.                                                                       Case No. 20-CR-196-1

THOMAS E. SMITH,

          Defendant.

---

### GOVERNMENT'S SENTENCING MEMORANDUM

---

Thomas Smith ("the Defendant") directed a scheme to defraud the Paycheck Protection Program ("PPP") and caused the submission of nine fraudulent loan applications seeking over $1,000,000 to Financial Institution 1. For his conduct, the Defendant faces a guideline sentencing range of 57-71 months' incarceration as recommended by the Plea Agreement (Dkt. 53) and a statutory maximum sentence of 30 years' incarceration. In light of the factors in 18 U.S.C. § 3553 and for the reasons set forth below, the United States respectfully requests that this Court impose a term of imprisonment of 63 months, in the middle of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range and two years of supervised release. The United States also asks that the Court order the Defendant to pay $960,000 in restitution.

### I.    FACTUAL BACKGROUND

In early 2020, as the COVID-19 pandemic spread across the country causing death and economic distress, the U.S. government assembled relief programs to help those whose livelihoods were jeopardized. Against this backdrop, "simple greed"

motivated the Defendant to use one such government program, the PPP program, as "an opportunity to get quick money." (Presentence Investigation Report, Dkt. 95, ¶ 87.) The Defendant sought to enrich himself by preparing multiple fraudulent loan applications, seeking over $1,000,000, using the names of companies owned by his family, friends, and acquaintances. After they received loans, he took up to 50% of the proceeds for his work recruiting his co-schemers and preparing the fraudulent loan paperwork. When he was confronted with the possibility that his crimes might be discovered, the Defendant doubled down, destroying evidence and creating sham legal documents to try to conceal what he did.

### A. The CARES Act

In March 2020, in response to the many challenges presented by the pandemic, Congress passed the CARES ACT, Pub. L. 116-136, which created the PPP. The PPP authorized $349 billion in forgivable loans to small businesses to be used for payroll, mortgage interest, rent/lease payments, or utilities. In April 2020, Congress authorized an additional $310 billion for PPP funding. These funds were designed to address the unprecedented crisis facing Americans—especially business owners whose livelihoods were threatened by the public health emergency. PPP funds were designed as a lifeline.

The program was designed to provide funds quickly and easily to qualifying individuals. PPP loans were not dispensed through any government bureaucracy; funds were distributed by banks who had existing relationships with many of the people in need. To apply, individuals submitted an application to a participating financial institution along with supporting documentation as to the business's payroll

expenses. The supporting documentation requirement was minimal, and could be satisfied with one years' worth of the company's tax records. If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA").

### B. Overview of the Scheme

A more detailed recitation of the facts relating to the scheme are detailed in the Defendant's plea agreement (Dkt No. 53), the plea agreements of his co-defendants and co-schemers, the PSR, and the government's submission regarding restitution. (Dkt. No. 87.)

Around April 4, 2020, the Defendant submitted two applications to Financial Institution 1 seeking $237,500 in PPP funds for his businesses A Better Living Family Services, LLC and ABL Towing and Recovery. (PSR ¶ 86.)[1] Financial Institution 1 funded those loans in full.

The Defendant told his brother, Stephen Smith, about successfully getting the PPP loans for his companies. Stephen Smith then asked the Defendant to help him get a loan for his business, CFA. There was only one problem: Stephen Smith's business was not operational at the time and had no employees or payroll, and thus was not eligible for a PPP loan. That did not deter the Smiths from pressing forward. Together, they created a fraudulent loan application for CFA seeking $242,500, which included false representations about the business and its payroll. They also created fake tax forms to support the application. Stephen Smith submitted the application to Financial

---

[1] A Better Living Family Services is owned by the Defendant's wife.

Institution 1 and the loan was funded in full. Stephen Smith then paid the Defendant $65,000 of the fraudulent loan proceeds for his assistance in preparing the fraudulent loan paperwork.

After seeing how easy it was to get the money through both the legitimate and the fraudulent applications, the Defendant, sometimes in conjunction with Stephen Smith and other times on his own, reached out to at least seven other people submit more fraudulent loans. The Defendant only had one requirement for the people he sought: an existing company. It did not matter if the company was defunct and non-operational. It did not matter if it had zero employees and no physical location. The Defendant knew that he could apply for loan funding by lying about the company's status and employees, supported by fake tax returns. The Defendant filled out the loan applications and created the fake documents to support them; he only required the applicant that he recruited to sign his name.

In exchange for sharing this knowledge, the Defendant was not leaving empty-handed. He required a fee paid from the proceeds, anywhere from $30,000 to $115,000 per loan. To conceal the payments, the Defendant told his co-schemers to split the payments among his various companies and gave them cover stories to provide to those who asked why the Defendant was being paid. Through the scheme, the Defendant was involved in the submission of the following fraudulent loan applications:

| Applicant Company | Company Owner | Individuals Involved in Obtaining Loan | Loan Amount (Applied For) | Approx. Date of Loan Application |
|---|---|---|---|---|
| Davis Development Group Inc. | Samuel Davis | Samuel Davis<br>Thomas Smith<br>Stephen Smith | $177,500 | April 26, 2020 |
| CFA Auto Transport LLC | Stephen Smith | Thomas Smith<br>Stephen Smith | $242,500 | May 1, 2020 |
| Glory Transportation Services LLC | Robert Hamilton | Robert Hamilton<br>Thomas Smith<br>Stephen Smith | $155,000 | May 1, 2020 |
| Rebels Paris LLC | Deon Petty | Deon Petty<br>Thomas Smith<br>Stephen Smith<br>Marvin Fitzgerald | $155,000 | May 8, 2020 |
| Comfort Care Transit LLC | Tarone Woods | Tarone Woods<br>Thomas Smith | $230,000 | May 15, 2020 |
| Premier Logistic Solutions LLC | Jonathan Henley | Samuel Davis<br>Jonathan Henley<br>Thomas Smith | $212,500 (not funded) | May 20, 2020 |
| New Beginnings Family Services LLC | Stephen Smith / Marvin Fitzgerald | Marvin Fitzgerald<br>Thomas Smith<br>Stephen Smith | $230,000 (not funded) | May 24, 2020 |

The easy money the Defendant and his co-schemers received raised concerns at Financial Institution 1, the bank that received all of the loan applications in the scheme. A representative from Financial Institution 1 reached out to the Defendant on June 8, 2020. He lied about the payments he received from the others. He claimed that the $65,000 he received from Stephen Smith was for equipment and a trailer he sold. He claimed that the $45,000 he received from Petty was an advance rent payment. He claimed that the $75,000 he received from Davis was for an investment in a nursing

home.  And, he claimed that the $115,000 from Woods was for the purchase of a truck and other vehicles.

Following his conversation with the representative of Financial Institution 1, the Defendant created more fake documents to support his false stories about the payments he received from the loan proceeds.  He created a fake Bill of Sale for a Ford F350 between the Defendant and CFA Auto Transport, a fake Bill of Sale for Ford F350 Super Duty between the Defendant and Comfort Care, a fake Commercial Lease Agreement between T&T Holdings (the Defendant's company) and Rebels, and a fake Joint Venture Agreement between T&T Holdings and Davis Development.  The Defendant then provided these documents to Financial Institution 1 and gave copies to his co-schemers to provide to Financial Institution 1.

After the Defendant was contacted by Financial Institution 1, the Defendant also participated in a conversation with Stephen Smith, Petty, and Fitzgerald to come up with a consistent story to tell the bank to conceal their crimes.  The Defendant also called Davis and directed him on how to respond to questions about the payment.  These stories included providing the bank with the fake documents that the Defendant created.  During this period, he also encouraged Woods to delete emails and text messages that the Defendant sent Woods about the loans.

## II.  PROCEDURAL BACKGROUND

A more detailed recitation of the procedural history of this case can be found in the Government's Position on Restitution.  (Dkt. 87.)  To summarize, on October 20, 2020, a grand jury returned an indictment charging the Defendant, Stephen Smith,

6

Davis, Hamilton, and Henley for participating in a bank fraud scheme between April 2020 and July 2020, in violation of Title 18, United States Code, Section 1344, and for engaging in money laundering, in violation of Title 18, United States Code, Section 1957. (Dkt. 1.)

The Defendant pled guilty to Count Two of the Indictment (Bank Fraud, in violation of Title 18, United States Code, Section 1344) pursuant to a written plea agreement on February 23, 2021. (Dkt. 53.) Sentencing is scheduled for June 2, 2021.

## III. SENTENCING GUIDELINES CALCULATIONS

The Final Presentence Investigation Report, filed on May 25, 2021, determined that the total offense level was 26 and that the Defendant's criminal history category was II, which corresponds to an advisory Guidelines range of 70 to 87 months' imprisonment. (PSR ¶¶ 101, 113.) The Probation Officer found that the Defendant was subject to a Base Offense Level of seven under U.S.S.G. § 2B1.1(a)(1). (*Id.* at ¶ 91.) The Defendant then received a 14-level enhancement for a loss exceeding $550,000 but less than $1,500,000 under U.S.S.G. § 2B1.1(b)(1)(H). (*Id.* at ¶ 92.) The Defendant received a two-level enhancement because the offense involved sophisticated means under U.S.S.G. §2B1.1(b)(10)(C). (*Id.* at ¶ 93.) The Defendant also received a four-level enhancement for his role as an organizer, leader, manager, or supervisor of a scheme involving five or more individuals under U.S.S.G. §3B1.1(a). (*Id.* at ¶ 95.) The Defendant also received a two-level enhancement for obstruction of justice under U.S.S.G. §3C1.1. (*Id.* at ¶ 96.)

The United States maintains its objection to the four-level enhancement for the Defendant's role in the scheme.² The United States, pursuant to the plea agreement, submits that a two-level enhancement under § 3B1.1(c) for his role as an organizer, leader, manager, or supervisor is appropriate, rather than the four-level enhancement sought by the Probation Office. (Dkt. No. 53, ¶ 19.) Background Note of § 3B1.1 states:

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of §3B1.1(c).

The Defendant was an organizer of the scheme, but the scheme was not as extensive in scope, planning or preparation to warrant a four-level increase under § 3B1.1(a).

The parties and the Probation Office agree that the Defendant is entitled to a two-level reduction for acceptance of responsibility. The Defendant has assisted authorities in the investigation and prosecution of his own misconduct by pleading guilty prior to indictment, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently. Therefore, the United States moves the Court, under Section 3E1.1(b), to grant the Defendant an additional one-level reduction in the offense level for acceptance of responsibility if the Defendant receives the two-level reduction for acceptance of responsibility.

---

² The government submitted this objection to the Probation Office on May 19, 2021. The government's letter with the objection is included in the Addendum to the PSR (Dkt. 95-1), though the Addendum states that the government did not have any objections to the PSR.

The United States determines that the Total Offense Level should be a Level 24. With a Total Offense Level as Level 24, and a Criminal History Category of II, the Sentencing Guidelines recommend a sentence between 57- and 71-months' imprisonment.

## IV. CONSIDERATION OF FACTORS UNDER SECTION 3553(A)

### A. Nature and Circumstances of the Offense

To try to alleviate the significant impact of the COVID-19 pandemic on businesses, the federal government provided PPP loans. The program was designed to get money in the hands of suffering Americans quickly, so it removed much of the "red tape" that often surrounds these types of programs. This included only requiring limited supporting documentation and relying on the honesty of applicants. The Defendant turned the features of the program into his advantage and exploited the system.

It is all the more aggravating that the Defendant, a small business owner himself who relied on two PPP loans to support his own businesses, chose to defraud the program. By recruiting others to fraudulently apply for these loans, the Defendant deprived legitimate small business owners of the opportunity to get the funds. The fact that his own businesses had already been taken care of at the time make clear that this was not money that he needed – this offense was motivated purely by greed.

Further, the Defendant was the clear organizer and leader of the scheme. This is evidenced by the fact that the Defendant put together all of the loan paperwork and fake tax documents, and also shown by the fact that he took such a sizable cut of the

9

loan proceeds. While his co-schemers have fully admitted that they willingly went along with the Defendant's scheme, it should not be overlooked that the Defendant, who was running two successful businesses, sought out people who were less sophisticated and in less secure financial positions to perpetuate his fraud. Most of his co-schemers had not heard of the PPP before the Defendant or his brother approached them. In most of these cases, the Defendant took advantage of his co-schemers' need for money and trust in his business acumen.

Finally, the offense was not limited to obtaining funds fraudulently. It also involved significant efforts towards concealing the true nature of the offense. When the bank started to inquire about the loans, the Defendant did not merely lie; he took the additional step to create fraudulent legal documents and cover stories to try to conceal the real reason he received payments from his co-schemers.

### B. History and Characteristics of the Defendant

The Defendant is a 47-year-old man who is in good health. (PSR ¶¶ 118, 130.) He grew up in a stable family and has close relationships with an extended family. (*Id.* ¶¶ 120-124.) The Defendant also appears to have been in a stable marriage for over 20 years. (*Id.* ¶ 127.) They also have five adult children. (*Id.* ¶ 127.) The Defendant and his wife have successful businesses and live in a family home together in Pewaukee. (*Id.* ¶¶ 136-37, 129.)

According to the PSR, the Defendant's criminal history category is II based on various offenses committed from age 16 to 38. (PSR ¶¶ 103-117.) Some of his offenses involved allegations of violent behavior. (*Id.* ¶ 108, 116.)

10

Though the Defendant agreed to plead guilty and accept his responsibility for the offense, he continues to minimize his role as leader of the scheme.[3] In his statement regarding the offense, the Defendant suggested that that Stephen Smith "wanted me to assist him in an application for a PPP loan." (PSR ¶ 86.) He also claimed that after he helped Stephen Smith get a fraudulent PPP loan, that "[w]ord got out that I knew how to put together the applications and I did assist in the creation of false documents for others." (PSR ¶ 86.)

First, it is irrelevant whether Stephen Smith or the Defendant suggested that Stephen Smith obtain a fraudulent PPP loan. The fact that Stephen Smith was willing to provide the Defendant with $65,000 of the $242,500 loan strongly suggests that the Defendant was not a passive assistant in obtaining the loan, regardless of his characterization of his actions as simply responding to his brother's request. There is no question that Stephen Smith was involved in recruiting people to the fraudulent loan scheme, but it does not discount the Defendant's own involvement. The Defendant's role as the true leader of the scheme is most apparent by the fact that there are certain loans that Stephen Smith was not involved with at all, such as the Comfort Care loan.

Second, the Defendant's characterization about "word getting out" is inconsistent with the accounts of almost every other co-schemer in this case. The Defendant and his brother actively sought out people with businesses to apply for these

---

[3] As noted above, the United States will still move this Court to grant an additional one-level reduction in the offense level for acceptance of responsibility because he agreed to plead guilty in a timely manner. The United States notes, however, that the Defendant's statements to Probation and in his Sentencing Letter appear to minimize his role in the offense.

11

loans and receive a cut of the money; the co-schemers did not approach them. Furthermore, his statement appears sequentially inconsistent with the timing of the other loans involved in the scheme because Samuel Davis' loan application was submitted before Stephen Smith's loan application.

Finally, in his sentencing paper (Dkt. 94), the Defendant notes that he met with the government on two occasions as an example of his total acceptance of responsibility. While it is accurate that the Defendant met with the government twice as part of the resolution of this case, a second meeting was required because the Defendant continued to minimize his criminal conduct during the first meeting with the government. The fact that it took the Defendant two meetings to fully admit his wrongdoing should not be weighed in his favor.

### C. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and to Provide Just Punishment for the Offense

The Defendant stated that the motivation for the offense was simple—"greed." (PSR ¶ 87.) *See United States v. Ranum*, 353 F.Supp.2d 984, 990 (E.D. Wisc. 2005) (noting Supreme Court opinion supporting court consideration of "defendant's motive for committing the office" as an "important" factor in sentencing). This weighs in favor of a more serious sentence. *See e.g. United States v. Eggleston*, 347 F.Supp.3d 381, 384 (E.D. Wisc. 2018) (in bank fraud case, noting as a mitigating factor that embezzlement offense was committed to support business rather than for personal enrichment). The Defendant's sole objective was to have more money from these offenses. At a time

when the government, businesses, and communities were working to help those in need, the Defendant instead chose to enrich himself.

> **D. Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct**

The government believes a serious sentence in this case is necessary for both specific and general deterrence.

The Defendant's criminal record indicates that he has been willing to skirt the law routinely, even for matters he might consider less severe, such as retail theft and cashing a counterfeit check. That casual attitude about the law appears to have carried over to this offense where he was willing to take advantage of vulnerabilities in the PPP loan program.

With respect to general deterrence, there is a strong need to send a message about the significance of this type of offense. *See United States v. Goss*, 325 F.Supp.3d 932, 935 (E.D. Wisc. 2018) (noting "general deterrence may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are rationale actors who would be dissuaded by the prospect of prison"). Especially in a case involving PPP fraud, it is important to put any would-be offenders on notice that these offenses do not go unpunished. Indeed, as the pandemic continues to impact small businesses, the PPP loan program remains in effect through May 31, 2021, and small businesses can still apply for PPP loans. Furthermore, the program now will move into the loan forgiveness stage. Actors like the Defendant who seek to defraud this program make it more difficult for administrators of the program to get aid to

individuals that qualify for and need it. The Defendant's sentence should serve as a warning and deterrent to others inclined to exploit pandemic relief programs.

### E. Consideration of the Types of Sentences Available and to Reflect Policy Statements

In testimony on April 20, 2021 by Hannibal "Mike" Ware, the Inspector General of the U.S. Small Business Administration, he stated, "[t]here is no higher priority for our office than providing oversight of SBA and the taxpayer's funds at risk through the Coronavirus Aid, Relief, and Economic Security (CARES) Act ensuing legislation and related pandemic response laws aimed at mitigating the pandemic." *See* Statement for the Record, April 20, 2021, U.S. House Committee on Small Business Administration, *available at* https://www.sba.gov/sites/default/files/2021-04/Statement%20for%20the%20Record%204.20.21%20-%20508.pdf. In his written statement, Inspector General Ware described the fraud-prevention initiatives which were designed to protect program funds from opportunistic criminals. He noted that the PPP funding put "strain" on the SBA's operations and revealed some of the "systemic weaknesses" in the SBA's programs. *Id.* at 4.

The federal government should be able to provide emergency funds like PPP loans to the deserving public without having to feel constrained by possible fraudsters who seek to profit from the national disaster. It is important to impose a significant sentence on someone who did not just misrepresent himself in a loan program in the wake of a national disaster, but who acted brazenly, getting loan after loan, and recruiting others into his fraudulent scheme.

## F. Need for the Sentence to Avoid Unwarranted Sentencing Disparities

There are two relevant points of comparison to avoid unwarranted sentencing disparities: sentences associated with others convicted of PPP related fraud, and those in this case. Around the country, only a few defendants have been sentenced to date for PPP related frauds, but those courts have imposed meaningful jail sentences in similar cases. *See, e.g.*, *United States v. David Hines*, 21-CR-20011, S.D.FL. (imposing 78-month sentence on an individual who fraudulently applied for multiple PPP loans with a loss of $3.9 million and also assisted others in submitting fraudulent PPP loans); *United States v. Ganell Tubbs*, 20-CR-193, E.D.AR (imposing 41-month sentence on an individual who fraudulently applied for two PPP loans with a loss of $1.9 million); *United States v. Tarik Jaafar*, 20-CR-185, E.D.V.A. (imposing 12-month sentence on an individual who fraudulently applied for 18 PPP loans with a loss of $1.4 million); *United States v. Zhang*, 20-CR-169, W.D.W.A. (imposing 60 day sentence on an individual who fraudulently applied for multiple COVID-19 relief program loans, including four PPP loans with a loss of over $900,000).

In this case, as compared to the others involved in the scheme, the Defendant is the most culpable. Notwithstanding his characterization of the origin of the scheme, the facts support the conclusion that the Defendant learned of the ease of getting PPP loans and decided to recruit others to exploit the program. The Defendant brought others into the scheme, actually completed their loan paperwork, created false tax documents for their companies, and in at least one case paid the money that enabled a co-defendant to reinstate his company with the state to facilitate the PPP loan. The Defendant was

15

the only person involved in every single fraudulent loan submitted through the scheme. His sentence should reflect that he was the most culpable.

## V. RESTITUTION & FORFEITURE

The government incorporates its Position on Restitution for Sentencing, filed on April 13, 2021 at Docket No. 87. For the reasons explained in that submission, the Defendant should be ordered to pay $960,000 in restitution, based on the five funded PPP loans that he facilitated.

The government is not seeking a separate forfeiture judgment against the Defendant.

\* \* \*

For the reasons stated above, the United States respectfully requests that the Court impose a term of imprisonment of 63 months, two years of supervised release, and order the Defendant to pay $960,000 in restitution. The United States submits that this sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully Submitted,

DANIEL KAHN
Acting Chief, Fraud Section
U.S. Department of Justice

*/s Laura Connelly*_____
LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys
Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Phone: 202-307-1423
laura.connelly@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide copies to counsel for all parties.

                                            */s Laura Connelly*_____
                                            LAURA CONNELLY
                                            LESLIE S. GARTHWAITE
                                            Trial Attorneys
                                            Fraud Section
                                            U.S. Department of Justice